Good morning, Your Honors. May it please the Court. My name is Siobhan Briley, and I represent the Paddock, LLC. The Bankruptcy Court and the Bankruptcy Appellate Panel committed significant clear error. First, both courts, neither, excuse me, neither court addressed the case in Ray Green, which was cited to both courts in all of the briefing. Both courts held that the manufactured helmet issue was not real property under Missouri law that was similar to Iowa law at the time that, in Ray Coleman, the Eighth Circuit case cited was decided. The Missouri case, or the Missouri statute cited by both the Bankruptcy Court and the It's not anything like Iowa law, is it? No, it's not. No, it's not. It's a very detailed process. Correct. But the Green case is under Illinois law, right? That is correct. So it's not similar either. It's not similar in that it is from a different jurisdiction. Yeah, and the law different in Illinois than Iowa? No, the law cited in Ray Green, Illinois common law, is nearly identical to Iowa common law regarding fixtures. And the facts in Ray Green are nearly identical to the facts in this case. Do I understand that this prefabricated house sits on real estate under a lease for 999 years? That is correct, Judge Beam. The ground lease, which is the, I believe it's the first document in the joint appendix, gives the debtors, in this case Mr. and Mrs. Bennett, an initial, I don't remember what the initial, 99-year lease that renews for successive periods of 99 years unless Mr. and Mrs. Bennett canceled that lease. That's kind of like buying the property, isn't it? Buying the real estate? That is correct. That has been the Paddock's argument all along that Mr. and Mrs. Bennett have effectively, perhaps not a fee simple interest in the underlying realty, but certainly a multiple life estate in the underlying real estate. Real estate, this wouldn't be an issue. This would clearly be real estate, the house and the land. I'm sorry, Judge Beam. I missed the beginning of your question. I understand that if the lease is the same as owning the real estate because of its length and the house sets on it, then we wouldn't have this dispute. Clearly, the piece of property would be real estate. Well, that's a good question, Your Honor. The analysis would be the same to determine whether the house is a fixture given that it begins as personal property under Iowa law. I think what we would be looking at, though, is a different interest of Mr. and Mrs. Bennett in determining whether the home is a fixture because if they outright owned the land, there would be no question that if they had hired somebody to build a stick-built house on a piece of real estate that they owned, the real estate and the house would be considered a piece of real estate, right? Yes, that is correct, Your Honor. Well, isn't the issue here exactly the same no matter how we look at it? The question is one of intent to permanently affix the personality to the real estate such that it becomes part of the real estate. Yes, that is that. That would be the same whether you took this pre-manufactured home and you put it on a piece of property that you own or a piece of property that you've leased. It doesn't really matter. While the 99-year lease renewable to apparently eternity is interesting, 990 years, I guess, while that's all interesting, it doesn't really matter because the question really is about what happens to this piece of personal property when it's attached to the land, and that's all about intent and how it's affixed, right? That is correct, Judge Erickson. It was the paddock's intent to affix the home permanently to the underlying real estate, and that is state. But if you construct a stick-built house there, that's personality until it's built into a residence on a piece of property that you own. Yes, that is correct. In this case, the ground lease is clear that the manufactured home, once attached to the underlying realty, became a permanent accession and fixture. The bankruptcy court concluded otherwise on the basis that the, and this is found at page 59 in the joint appendix, on the basis that the piers were subject to sinkage, and then on page 60, that the structure underneath the home to which you can attach the wheels and axles had not been removed. Neither of those facts, to the extent that they have any bearing on this, defeat the paddock's intent to make the home a permanent accession to the underlying realty. This is a question, but I think you agree that this is clearly erroneous even on the intent, right? The finding of intent is a fact. That's a good question, Judge Banton. Well, that's what Justice Kagan, I think, is trying to say. You all cite, and I think the BAP cites the U.S. Bank National Association case. I bet you're familiar with the long debate that's apparently settled there about how we do mixed questions. Yes. So is the finding of intent a fact? Under the controlling case law regarding the law of fixtures in Iowa, yes, I would agree with you. Intent can be inferred from the circumstances. So it's either stated as a fact or it's inferred from the circumstances. So, yes, Judge Banton, it is a finding of fact. I think that's what she, Justice Kagan, is trying to say. She speaks for the court, too, I might quickly add. Correct. Go ahead. Yes. And they're all indications here. It's important to point out that the intent that matters is the intent of the party affixing the structure to the land, not somebody else's intent. What intent would they have to have? To make the structure a permanent accession. They're permanent residents. Well, in this case, it would be that the paddock would have to intend that the manufactured home be a permanent accession to the underlying realty. And that does tie back to federal law, which is cited in the ground lease, the very long National Manufactured Home Standards of Safety and Construction. That's not exactly correct. But that law requires certain aspects of attachment for a manufactured home to comply with federal law. It requires the permanent chassis, which is the underlying structure which was not removed. It requires certain types of affixation to the land so it complies with federal law. Part of the dispute here is how it's affixed. If they'd went in and done a foundation, poured a concrete foundation and set it on that, this wouldn't be a dispute at all. But since it has on concrete pillars and so forth, it's the house's personality and the land is realty. Is that the way this has been worked out? Well, that was the finding of the bankruptcy court. And the bankruptcy appellate panel also.  The method of affixing it to the land is less relevant than was emphasized by the courts below because there's no requirement that there be a permanent foundation. And the paddock did show that the piers which the bankruptcy court found appeared to be sinking are required by federal law to be embedded below the frost line, which in Iowa is close to 60 inches. So they have been embedded deeply. Yes. And so there is no allegation at all that the paddock has not complied with federal law in securing the home to the piers. So that finding by the bankruptcy court is clearly erroneous because those piers are required to be embedded 60 inches into the ground. Thank you.  You're welcome. We request that the court reverse the bankruptcy appellate panel and the bankruptcy court. And I have used my time for rebuttal. So thank you, Your Honor. We will give you one minute so you know what to do as you sit down. Okay. We'll round to the one minute since it's a 10 minute case. Thank you. Thank you. Sure. We'll hear from Mr. Shortley. Thank you, Your Honor. My name is Rush Shortley. I'm an attorney from Cedar Rapids in Iowa City, Iowa. And I represent Benjamin and Theresia Bennett, the appellees in this case. May it please the court. As Judge Erickson pointed out and focused the entire discussion, the primary consideration here is the intent of the party affixing the object under discussion, here a manufactured home. And we discern that intent how? To the real estate, whether it's intended to be a permanent fixture or not. The one thing that hasn't been discussed so far is how is the property treated in the transactional documents between the parties? The transactional documents, which I think are very revealing regarding the intent of the paddock, clearly treat the property as personal property throughout. As a matter of fact, the documents take a special care to maintain the separation between the owner of the manufactured home and the owner of the underlying real estate. They make a special effort to ensure that everybody knows that the personal property taxes on the mobile home, manufactured home, are to be paid by the residents, the purchasers, the Bennett's, and that the underlying real estate taxes will be paid by the landowner, the paddock. And in this case, which is also the secured party. From the money from the 999-year lease, right? Oh. They would pay that? That is the only thing required to be paid, Your Honor, under the lease on an ongoing basis is what they call a community fee, which is apparently for the maintenance of the common areas. So they get to use this piece of property to put this manufactured home on this piece of real estate for 999 years for nothing? Is that what I'm understanding you to say? Well, in the hearings, there was a claim by the paddock that they had made a charge, which was a part of the purchase price for the lease fee. The lease refers to a fee, but there's no place anywhere that specifies how much it is and how it's to be paid. The fee that's paid on a monthly basis started out at $135, and it's now $150. Per month. Per month is the homeowners association fee that everybody pays. Now, of course, the real finding of the bankruptcy court on this is we can't tell on the fees, right? Isn't that the fair reading of page 8? We really can't tell on the fees what's really going on. That's true. I believe that. It says it very plainly. And also, I mean, who cares what they use the fees for? Once they're paid, they're going to use them, hopefully, for an appropriate purpose. It does reflect on the second prong, whether the home is put to the same use as the realty. You get that. Go ahead. And the bankruptcy court clearly held that they were separate uses. One use by the intended use of the home itself is as a residence for a family, and the intended use for the underlying real estate is as a lot to be rented out. That is the main finding, but, you know, they take it away, they pull the rug out in the next sentence. They don't have to really resolve that, whether they're the same use or not. Well, it's still there. I know what they say four lines about that, but the final point is the court need not resolve this issue. And in direct response to Judge Beam's question regarding the 990-year lease, three times 99, normally when you see those kinds of leases and somebody goes in to erect a building, a manufacturing building normally or an office building, at the end of the lease the ownership of the building reverts to the landowner. The people walk out and leave the building behind. In this case. Well, if they walk out and leave the building behind, but in this case that's not the fact. Well, if they terminate the lease, the building stays. In this case, these documents do not provide that. As a matter of fact, the clear intent of these documents is that the residents, if they terminate the lease under the terms of the lease, that they pick up the home and leave with it. They must abandon the site. They do not, say, abandon the home and the site. And that's a different thing than, like, if you lease land from the railroad for 99 years and it's sitting in downtown and you build a hotel on it, at the end of the 99th year, the railroad owns your hotel. And you walk away from it and that's the way it is. Now, this particular contract specifically says, at the end of the lease, if you leave, you take the house, right? That's right. And that's evidence that it remains personal property, right? Because if it's realty, you would only damage the underlying land by removing it. And the theory here is that you're required to take it and leave. And, Your Honor, there's nothing in the record that suggests, as was in the Ford v. Vaynard case, that there would be any significant damage done to the house if you took it apart and put it on whatever type of conveyance, brought it in, hauled it off, and put it on a new location. There's no suggestion that it would be like trying to move your house or my house, assuming we have a house in town somewhere or out in the country, that we would be severing it from the foundation and doing what house movers do. Well, it was severed from the foundation when it came in, so why wouldn't it be severed from the foundation? If you're talking about tearing the house apart and taking it off, I'm not following your argument. Your Honor, it was never really attached to the foundation. As a matter of fact, the foundation, according to the testimony, the only testimony of somebody who had direct knowledge, the foundation would occasionally fall away from the house and it would have to be resupported with more, you know. Yeah, the testimony basically was that it sat on pylons or piers, I guess is what the word is. Piers and blocks. Yeah, and then the blocks. The piers were sinking, the blocks would be falling away, and then this guy who had your client who has a background in the masonry business would go back in there and lift it up, shore it up, do what needed to be done to maintain the stability of the structure, right? That's what I recall the testimony being, Your Honor. Which is the same as would happen with a stick-built house. If the foundation started to fall away, you hire somebody to repair the foundation and go right on living in the house for 999 years in this case, I guess. The difference between that is that you have a foundation that is originally put below the frost line and that there's been some outside pressure or change to affect the quality of the foundation after a number of years. But these pillars had to be 60 inches down under federal law. Well, there's no indication that they were. Okay, let's go slowly because the bankruptcy judge says that nobody shows they're deeply embedded. The paddock did not show they were deeply embedded. The only evidence is, of course, your client's testimony that was found credible that one was sinking and they weren't deeply embedded. Now, what evidence was put before the bankruptcy court as to the federal law or whether this complied with the federal law? None. Absolutely none? Absolutely none. Okay, thank you. It was never an issue. It's been brought up as an issue on the appeal. And also, it's clear that the paddock intended this property be treated as personal property. in the documentation is that the homeowner, the resident, could refinance the property. And in that event or in the event of a default on the secured claim regarding the sale of the home, the lender could come in and take over possession of the home and terminate the lease and do what it wished with the property. There's no indication that they have to leave it behind. The only requirement of the resident that's set out anywhere in the lease is that if they terminate the lease, they have to leave the real estate, the underlying lot, in good condition. Thank you for your argument. And we would request that the decision of the bankruptcy court be affirmed, Your Honors. Thank you, Mr. Shortley. Ms. Bradley, you have a minute. Thank you, Your Honors. Just to point out that the references to personal property in the transactional documents are solely to protect the debtors and any lien holders that might have liens on the property. They are not there to override the clear statements that the home is a permanent accession to the underlying realty. And one piece of evidence that neither the bankruptcy court nor the bankruptcy appellate panel addressed are the photos of the debtor's residence and similar residences at pages 44 through 49 in the joint appendix. Were they introduced before the bankruptcy court? Yes, they were. Okay. And they were exhibits, I think, C and D, before the bankruptcy court at the hearing. Did the testimony refer to them? Yes. Ms. Claymaker, who testified for the Paddock, referred to them. Then they were impliedly reviewed by the bankruptcy court, surely. Yes. There was no reference in any of the opinions, but these show that it is not a simple matter of just, quote, Thank you, Your Honors. A question? Go ahead. Judge Beam. I'm sorry, Your Honor? Tell us the citation in the record that you referred to of the photos. In the joint appendix, pages 44 through 49. Okay. Were there six of them then, if my math is right? Yes, that is correct. The first two are pictures of Mr. and Mrs. Bennett's home. The next four are pictures of similar homes in the same community. And that would be evidence that the bankruptcy court should have considered? Yes, Your Honor. Okay. Thank you. But they were referred to during testimony. Were they referred to during testimony by both your property manager and by Mr. Bennett? I don't recall off the top of my head whether Mr. Bennett testified about the photographs. So I don't know. But the property manager certainly did. Yes, yes. I introduced them so that she would testify about them and when they were taken. One other trivial detail. Who went first? The paddock went first. The property manager was on first. The property manager was first. Okay. Thank you. Thank you. Okay. Case number 18-2098 is submitted for decision.